## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOHN CUNNINGHAM** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-3339** |
| **JERRY GOODWIN** | **SECTION: "G"(1)** |

## REPORT AND RECOMMENDATION

Petitioner, John Cunningham, a Louisiana state prisoner, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For all of the following reasons, **IT IS RECOMMENDED** that the application be **DISMISSED WITH PREJUDICE**.

On June 8, 2012, petitioner pleaded guilty to two counts of manslaughter under Louisiana law and was sentenced to consecutive terms of thirty and forty years imprisonment.[1] On September 25, 2013, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[2] His related writ applications were then denied by the Louisiana Supreme Court on April 4, 2014,[3] and by the United States Supreme Court on October 6, 2014.[4]

On January 6, 2015, petitioner filed an application for post-conviction relief with the state district court.[5] That application was denied on December 8, 2015.[6] His related writ applications

---

[1] State Rec., Vol. 9 of 18, transcript of June 8, 2012; State Rec., Vols. 6 and 7 of 18, minute entries dated June 8, 2012; State Rec., Vols. 1 and 2 of 18, guilty plea forms.

[2] State v. White, Case No. 2012-KA-1768 c/w 2013-KA-0106, 2013 La. App. Unpub. LEXIS 601 (La. App. 4th Cir. Sept. 25, 2013); State Rec., Vol. 9 of 18.

[3] State v. Cunningham, 135 So. 3d 638 (La. 2014); State Rec., Vol. 18 of 18.

[4] Cunningham v. Louisiana, 135 S. Ct. 128 (2014).

[5] State Rec., Vol. 16 of 18. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to the *pro se* filings in this case, this Court will simply use the signature date of the applications as the filing date, in that the applications were obviously placed in the mail no earlier than the date they were signed.

[6] State Rec., Vol. 2 of 18, Judgment dated December 8, 2015.

were likewise denied by the Louisiana Fourth Circuit Court of Appeal on June 23, 2016,[7] and by the Louisiana Supreme Court on January 9, 2018.[8]

On March 19, 2018, petitioner filed the instant federal application seeking habeas corpus relief.[9]  The state filed a response to that application,[10] and petitioner filed a reply to the state's response.[11]

# I.  Timeliness

In its response, the state argues that petitioner's federal application is untimely.  However, the state notes that its position on that issue is not unassailable and, therefore, "submits that the Court may pretermit a ruling on the issue of timeliness" and simply deny relief on the merits.[12] Nevertheless, in the interests of completeness, the Court will address the timeliness of the application.

"The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on 'the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (quoting 28 U.S.C. § 2244(d)(1)(A)).[13]  Where, as here, a petitioner pursued direct review all the way through the United States Supreme Court, his state criminal judgment became final for AEDPA purposes on the date that court denied relief.  See, e.g., San Martin v. McNeil, 633 F.3d 1257, 1266 (11th Cir. 2011) ("[D]irect review of a state judgment of

---

[7] State v. Cunningham, No. 2016-K-0312 (La. App. 4th Cir. June 23, 2016); State Rec., Vol. 16 of 18.

[8] State ex rel. Cunningham v. State, 232 So. 3d 544 (La. 2018); State Rec., Vol. 16 of 18.

[9] Rec. Docs. 1 and 5.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner declared under penalty of perjury that his application was placed in the prison mailing system on March 19, 2018.  Rec. Docs. 1 and 5, p. 34.

[10] Rec. Doc. 13.

[11] Rec. Doc. 14.

[12] Rec. Doc. 13, p. 6.

[13] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

conviction concludes on the date of the [United States] Supreme Court's denial of a petition for writ of certiorari."); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001) ("'[D]irect review,' as used in Section 2244(d)(1)(A), includes direct review by the United States Supreme Court via writ of certiorari, and … the limitations period for state prisoners therefore begins to run only after the denial of certiorari or the expiration of time for seeking certiorari."); Kapral v. United States, 166 F.3d 565, 575 (9th Cir. 1999) ("While the term 'direct review' is not defined in § 2244(d)(1)(A), it is axiomatic that direct review of a state court criminal judgment includes the right to seek certiorari review in the United States Supreme Court.  Therefore, a state court criminal judgment is 'final' (for purposes of collateral attack) at the conclusion of review in the United States Supreme Court or when the time for seeking certiorari review expires." (citations omitted)); Lash v. Rednour, 719 F. Supp. 2d 1014, 1018 (C.D. Ill. 2010); Calvin v. McDaniels. 635 F. Supp. 2d 1197, 1203 (D. Nev. 2009).

Accordingly, petitioner's state criminal judgment became final for AEDPA purposes, and his federal limitations period therefore commenced, on October 6, 2014, when the United States Supreme Court denied his direct-review petition for a writ of certiorari.  His AEDPA limitations period then expired one year later, unless that deadline was extended through tolling.

Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

After ninety-one (91) days elapsed, petitioner tolled his federal limitations period by filing a post-conviction application with the state district court on January 6, 2015.[14]  Tolling then

---

[14] State Rec., Vol. 16 of 18.

continued uninterrupted for the duration of the post-conviction proceedings – so long as he sought supervisory review in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). That qualifying phrase is of importance in the instant case.

The state district court denied petitioner's post-conviction application on December 8, 2015.[15] A litigant normally has only thirty days to seek review of such a denial by filing a writ application with the applicable Louisiana Court of Appeal. See Louisiana Uniform Rules of the Courts of Appeal Rule 4-3. Petitioner did not meet that deadline.[16] Nevertheless, because the Court of Appeal addressed the application without raising the timeliness issue, the presumption is that the court considered the application timely filed. See Grillette, 372 F.3d at 775 ("[W]hen the denial of an application is based on untimeliness, Louisiana courts routinely and unmistakably indicate so in their opinions. Thus, had the Louisiana Court of Appeal decided to reach the merits of the application notwithstanding a determination that the application was untimely, it appears that the court would have indicated any such untimeliness in its opinion." (citations omitted)); see also Bourgeois v. Bergeron, Civ. Action No. 09-3185, 2009 WL 5088756, at 4 (E.D. La. Dec. 23, 2009) ("While one could perhaps argue that the Fifth Circuit is too generous in its assumption that evident untimeliness is always noted without fail by the state courts, this Court may not unilaterally ignore the presumptions employed in Grillette.").

Similarly, after the Louisiana Fourth Circuit Court of Appeal denied relief on June 23, 2016,[17] petitioner then likewise had only thirty days to seek further review by the Louisiana Supreme Court. See Louisiana Supreme Court Rule X, § 5(a). Once again, he failed to meet that

---

[15] State Rec., Vol. 2 of 18, Judgment dated December 8, 2015.

[16] Petitioner's writ application to the Louisiana Fourth Circuit Court of Appeal was not even signed until March 9, 2016, approximately three months after the district court denied relief. State Rec., Vol. 16 of 18, writ application in case number 2016-K-0312.

[17] State v. Cunningham, No. 2016-K-0312 (La. App. 4th Cir. June 23, 2016); State Rec., Vol. 16 of 18.

deadline.[18]  The Louisiana Supreme Court nevertheless denied the writ application on the merits without addressing the issue of the writ's timeliness.  The question, therefore, is whether statutory tolling credit applies to a facially untimely Louisiana Supreme Court writ application denied by that court on the merits with no mention of the application's apparent untimeliness.

On the one hand, the United States Fifth Circuit Court of Appeals has held that its decision in Grillette is not controlling on that issue, noting that, unlike the rules of the Courts of Appeal, the Louisiana Supreme Court's rules expressly provide that extensions of time will not be granted for the filing of writ applications.  Butler v. Cain, 533 F.3d 314, 318 (5th Cir. 2008).  Therefore, where the Louisiana Supreme Court has not expressly granted such an extension despite the seeming prohibition or waived its rule, the presumption is that an *unexplained* denial of a facially untimely writ application is based on the untimeliness rather than on the merits.  See id. at 319.

On the other hand, the Louisiana Supreme Court's decision in this case *was not unexplained*.  The court expressly denied at least petitioner's ineffective assistance of counsel claims on the merits.[19]  Of course, the general rule is that a court's merits ruling with no mention of the timeliness issue does not necessarily mean that the court considered the writ application timely filed.  See Carey v. Saffold, 536 U.S. 214, 225-26 (2002) ("A court will sometimes address the merits of a claim that it believes was presented in an untimely way:  for instance, where the merits present no difficult issue; where the court wants to give a reviewing court alternative grounds for decision; or where the court wishes to show a prisoner (who may not have a lawyer) that it was not merely a procedural technicality that precluded him from obtaining relief.  Given

---

[18] Petitioner's related Louisiana Supreme Court writ application was not signed until July 27, 2016, more than thirty days after the Court of Appeal denied relief.  State Rec., Vol. 18 of 18, writ application in case number 2016-KH-1571.

[19] State *ex rel.* Cunningham v. State, 232 So. 3d 544 (La. 2018) ("Denied.  Relator fails to show that he was denied the effective assistance of counsel during plea negotiations under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."); State Rec., Vol. 16 of 18.

the variety of reasons why the California Supreme Court may have included the words 'on the merits,' those words cannot by themselves indicate that the petition was timely.").

Nonetheless, as the state concedes, no controlling jurisprudence addresses the issue of whether a petitioner is entitled to statutory tolling for a facially untimely Louisiana Supreme Court writ application denied on the merits with no mention of the timeliness issue.[20]  In light of that fact, the undersigned finds that it is appropriate to err on the side of caution when faced with such an unclear issue concerning timeliness in a federal habeas corpus proceeding.  See Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999) ("We must be cautious not to apply the statute of limitations too harshly.  Dismissal of a first habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." (quotation marks omitted)).

Accordingly, considering the foregoing and out of an abundance of caution, the Court finds that petitioner is entitled to statutory tolling from the date his post-conviction application was filed (January 6, 2015) until the date the Louisiana Supreme Court denied relief (January 9, 2018).[21] When the limitations period then resumed running at that point, petitioner had two hundred seventy-four (274) days remaining to seek federal habeas corpus relief.  Because his federal application was filed a mere sixty-nine (69) days later, the undersigned finds that the application was timely filed.  Petitioner's claims will therefore be considered on the merits.

---

[20] Rec. Doc. 13, p. 6 ("[U]ndersigned counsel is aware of no Fifth Circuit case finding a writ application untimely where, as here, the court did not expressly label the application untimely but did address one or more claims therein."). The Court finds counsel's candid concession on this point to be both refreshing and commendable.

[21] A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

## II.  Standards of Review

The AEDPA comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 572 U.S. 415, 426 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect

application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (emphasis added; citations omitted); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  White v. Woodall, 572 U.S. 415, 417 (2014).

### III.  Petitioner's Claims

### A. Sufficiency of the Evidence

Petitioner's first claim is that there was insufficient evidence to prove that he was in fact guilty of the crimes of which he stands convicted.  However, that argument misses the mark.

Petitioner, under oath and with the assistance of counsel, pleaded guilty. By entering his pleas, he relieved the state of its obligation to prove its case and waived any claim challenging the sufficiency of the state's evidence. Simply put: "The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2790, 61 L.Ed.2d 560 (1979), mandate that sufficient evidence exist from which a rational fact finder could find guilt beyond a reasonable doubt is inapplicable to convictions based on a guilty plea." Smith v. McCotter, 786 F.2d 697, 702-03 (5th Cir. 1986). See also Cornett v. Johnson, No. 97-11250, 1998 WL 546513, at *1  (5th Cir. Aug. 12, 1998) ("[Petitioner's] challenge to the sufficiency of the evidence underlying his guilty plea does not rise to the level of a federal constitutional issue."); United States v. Silva, No. 97-10266, 1998 WL 29992, at *1 (5th Cir. Jan. 6, 1998) ("[Petitioner's] sufficiency-of-the-evidence challenge is also waived by his guilty plea."); Simmons v. Morgan, Civ. Action No. 15-2298, 2015 WL 5971685, at *3 (E.D. La. Oct. 14, 2015), certificate of appealability denied, 2017 WL 3623649 (5th Cir. May 22, 2017). Therefore, petitioner's claim challenging the sufficiency of the evidence against him should be denied.

## B.  Ineffective Assistance of Counsel

Petitioner's second claim is that he received ineffective assistance of counsel. The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the United States Supreme Court established a two-prong test for evaluating such a claim. Specifically, a petitioner seeking relief must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. Id. at 697. A petitioner bears the burden of proof on the claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir.

2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to satisfy the prejudice prong of an ineffective assistance of counsel claim in a case involving a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); accord James v. Cain, 56 F.3d 662, 667 (5th Cir. 1995).

In the last reasoned state court decision addressing petitioner's ineffective assistance of counsel claims, the Louisiana Supreme Court denied relief, stating simply: "Relator fails to show he was denied the effective assistance of counsel during plea negotiations under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[22]

---

[22] State ex rel. Cunningham v. State, 232 So. 3d 544 (La. 2018); State Rec., Vol. 16 of 18.

Because ineffective assistance of counsel claims present mixed questions of law and fact, this Court must defer to that state court decision denying petitioner's claims on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation and quotation marks omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.

Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (emphasis added; citations and quotation marks omitted). Therefore, on a habeas review of ineffective assistance claims, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

In his federal application, petitioner first argues that his counsel was ineffective for failing to move to quash the indictments.[23] However, as the state notes in its response,[24] that claim was waived by virtue of petitioner's guilty pleas. <u>See, e.g.</u>, <u>Simmons v. Morgan</u>, Civ. Action No. 15-2298, 2015 WL 5971685, at * 3 (E.D. La. Oct. 14, 2015) ("[A] plea of guilty normally waives non-jurisdictional defects in the proceeding prior to the entry of the plea. This rule encompasses purported defects in an indictment." (citations omitted)), <u>certificate of appealability denied</u>, 2017

---

[23] Regarding the indictments, the state court record reveals the following: On April 22, 2010, a grand jury returned an indictment charging petitioner and Courtney D. White with the second degree murder of Jerome Mutin. State Rec., Vol. 7 of 18, indictment (case number 496-306). On August 5, 2010, a grand jury returned an indictment charging petitioner, Arthur Grandpre, Gerald Williams, and Philip Dominick with conspiracy to commit first degree murder and the first degree murder of David Neiswonger. State Rec., Vol. 10 of 18, indictment (case number 499-077).

[24] Rec. Doc. 13, p. 11.

WL 3623649 (5th Cir. May 22, 2017); Bargas v. Dretke, No. 2:00-CV-0376, 2003 U.S. Dist. LEXIS 19931, at *23 (N.D. Tex. Nov. 6, 2003) ("Petitioner also contends he was denied effective assistance of trial counsel … because counsel failed to file a motion to quash the indictments. Petitioner contends the indictments were defective …. [P]etitioner entered a knowing and voluntary guilty plea to the indictments he contends were defective and which he argues trial counsel should have attempted to have quashed. Petitioner judicially confessed to the crimes as alleged in the indictments, including the dates and, therefore, such claims should be waived."), adopted, 2003 U.S. Dist. LEXIS 21401 (N.D. Tex. Nov. 24, 2003).

Moreover, in any event, the Court notes that the claim also fails on the merits. On direct appeal, the Louisiana Fourth Circuit Court of Appeal held that petitioner was properly charged in the indictments,[25] and he has not shown otherwise. On the contrary, his theory as to this claim is that the indictments were invalid because the underlying facts as alleged by the state did not support the charges. However, as shown below, that is inaccurate.

The underlying facts of the killing of Jerome Mutin, for which petitioner and Courtney D. White were charged with second degree murder, were summarized by the Louisiana Fourth Circuit Court of Appeal on direct appeal as follows:

> The relevant facts of the murder that was charged in case number 496-306 arose on 23 December 2009. Late on that evening, the victim Jerome "Profit" Mutin was at the home of Glen Holly in the 2300 block of D'Abadie Street in New Orleans. Mr. Mutin was a drug dealer, and he had spoken on the phone with someone who was going to meet him at the residence to buy drugs from him. Someone knocked at the door, and Mr. Mutin answered the door, with Mr. Holly standing behind him. Mr. Holly testified that Courtney White, whom he knew, was standing on the steps right outside the door, while John Cunningham, whom he also knew, was standing at the foot of the steps. As Mr. Mutin was trying to look around Mr. White, Mr. White shot him in the head and then fled. Mr. Cunningham smiled at Mr. Holly and then fled. Mr. Holly slammed the door shut. Mr. Holly later identified both Messrs. White and Cunningham from photographic lineups. About

---

[25] State v. White, Case No. 2012-KA-1768 c/w 2013-KA-0106, 2013 La. App. Unpub. LEXIS 601, at *6-7 (La. App. 4th Cir. Sept. 25, 2013); State Rec., Vol. 9 of 18.

one week after Mr. Mutin's murder, Mr. Holly was shot and injured and another man at his residence, David Neiswonger, was shot and killed at his residence. Mr. Neiswonger's murder formed the basis of the charge against Mr. Cunningham in case number 499-007.[26]

The underlying facts of the Neiswonger killing, for which petitioner, Arthur Grandpre, Gerald Williams, and Philip Dominick were charged with first degree murder, was summarized by the Louisiana Fourth Circuit Court of Appeal in a pretrial opinion concerning the denial of a suppression motion. The Court of Appeal summarized the facts of that killing as follows:

> The charges in this case stem from a shooting that occurred in February 2010 in the 2300 block of D'Abadie Street in New Orleans. One victim was killed, David Neiswonger; and another victim was wounded, Glen Holly. The lead investigator of the shootings, Detective Orlando Matthews, testified at the March 2011 motions hearing that he developed Mr. Grandpre as the suspected gunman in the shootings. Detective Matthews showed a lineup containing Mr. Grandpre's photograph to a female witness, who was not an eyewitness to the shooting. She identified Mr. Grandpre as the shooter and noted that he dated her sister. Detective Matthews also showed the lineup to the surviving victim, Mr. Holly. Mr. Holly, however, was unable to make any identification. Using a more recent photograph of Mr. Grandpre, Detective Matthews compiled a second lineup. From the second lineup, Mr. Holly identified Mr. Grandpre as the man who shot him and the deceased.
>
> Further information led Detective Matthews to suspect that Mr. Williams was the person who drove Mr. Grandpre to the scene of the shooting. According to Detective Matthews, Mr. Holly told him that earlier on the morning of the shooting he saw a red Mustang pass by the residence. When Detective Matthews showed Mr. Holly a lineup containing Mr. Williams' photograph, Mr. Holly identified Mr. Williams as the man whom he saw driving the Mustang that morning several hours before the shooting. Mr. Holly indicated that he often saw this Mustang in the neighborhood parked near the residence where the shooting occurred. Mr. Holly also indicated that the man who shot him and the deceased was a passenger in the Mustang when it passed by the residence earlier that morning. Detective Matthews admitted that another man and woman were also present in the residence when the shooting occurred, but they were in another room. Because they both were so impaired by substance use at the time of the shooting that they would have been unable to make any identification, Detective Matthews did not show either of them a lineup.
>
> Based upon a jailhouse tip, Detective Matthews subsequently interviewed Mr. Dominick at police headquarters. After being advised of his Miranda rights and waiving those rights, Mr. Dominick gave a statement admitting that he spoke over the telephone with Mr. Cunningham (the Relator), who at that time was

---

[26] Id. at *5-6.

incarcerated in connection with an unrelated murder.  In his statement, Mr. Dominick told the detective that during his telephone conversation with Mr. Cunningham, Mr. Cunningham told him that Mr. Holly must have been "talking." Detective Matthews stated that Mr. Cunningham "basically" put a "hit" out on Mr. Holly.  Detective Matthews testified that the verbiage used by Mr. Dominick and Mr. Cunningham during the call, which was recorded as a matter of routine by the sheriff's office, paralleled that used in the movie State Property.  Detective Matthews testified that Mr. Dominick admitted Mr. Williams later called him and told him that he and Mr. Grandpre had "taken care of the matter."[27]

Contrary to petitioner's assertion, the facts properly support the criminal charges in this case for the following reasons.

As noted, petitioner was charged with the second degree murder of Jerome Mutin.  As the Louisiana First Circuit Court of Appeal recently explained:

> Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder, in pertinent part, as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm.  Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1).  Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction.  Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances.

State v. Magee, 243 So. 3d 151, 157 (La. App. 1st Cir. 2018), writ denied, 263 So. 3d 434 (La. 2019).  Further, "[s]pecific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person."  State v. Neal, 796 So.2d 649, 657 (La. 2001).

Here, the prosecution's theory of the case was that petitioner and White went to Holly's home with the intention of shooting Mutin over a dispute concerning the neighborhood drug trade.[28]  Despite the fact that only White fired the fatal shot, both he and petitioner could properly

---

[27] State v. Cunningham, 88 So.3d 1196, 1198-99 (La. App. 4th Cir. 2012); State Rec., Vol. 17 of 18.
[28] Petitioner decided to plead guilty on the fourth day of a jury trial on this charge.  Therefore, the state's theory of the case was readily apparent from the transcript of the trial up to that point.

be charged with second degree murder because, under the law of principals, all persons involved in the commission of a crime are equally culpable, and it is of no consequence which of the perpetrators fired the shot that killed the victim.  See, e.g., State v. Massey, 91 So.3d 453, 463-64 (La. App. 5th Cir. 2012); State v. Page, 28 So.3d 442, 449-50 (La. App. 5th Cir. 2009).  For the reasons, petitioner was properly indicted on the second degree murder charge.

The same is true with respect to the charge of the first degree murder of David Neiswonger. One of the prosecution's theories of that charge was that petitioner, while in jail awaiting trial for Mutin's murder, placed a "hit" on Holly, instructing his co-defendants in a telephone conversation to kill Holly.[29]    That theory would support a first degree murder charge as to the killing of Neiswonger, the individual who was actually killed during the "hit."

In pertinent part, Louisiana law provides:

A.  First degree murder is the killing of a human being:

….

(9) When the offender has specific intent to kill or to inflict great bodily harm upon a victim who was a witness to a crime or was a member of the immediate family of a witness to a crime committed on a prior occasion and:

(a) The killing was committed for the purpose of preventing or influencing the victim's testimony in any criminal action or proceeding whether or not such action or proceeding had been commenced; or
(b) The killing was committed for the purpose of exacting retribution for the victim's prior testimony.

La. Rev. Stat. Ann. § 14:30(A)(9).

---

[29] In the state's response to petitioner's motion for a bill of particulars, the prosecutor stated that the first degree murder charge was brought pursuant to "LA. R.S. 14:30(A)(3) and/or 14:30(A)(4) and/or 14:30(A)(9) and/or 14:30(A)(10)." State Rec., Vol. 3 of 18, State's Response to Defendant's Motion for Bill of Particulars for First Degree Murder. Because the facts indicate that the prosecution would face the fewest obstacles in proving petitioner's guilt under § 14:30(A)(9), only that theory of the cases is discussed herein.

Here, Holly was a witness to Mutin's killing and was cooperating with the police regarding that crime. The state's evidence showed that petitioner placed a "hit" on Holly with the specific intent to kill Holly to prevent that cooperation and his testimony at the trial of that charge. Although Neiswonger was not an intended victim, he was killed during the botched "hit." The charge was therefore still supported based on the theory of "transferred intent." See, e.g., State v. Gilliam, 827 So.2d 508, 515-16 (La. App. 2d Cir. 2002). As a result, petitioner was also properly indicted for that murder.

Accordingly, a motion to quash either indictment would have been meritless. It is beyond cavil that counsel cannot be considered ineffective for failing to make a meritless motion. United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").

For all of these reasons, petitioner's claim that his counsel was ineffective for failing to move to quash the indictments should be denied because it was waived by the guilty pleas and, alternatively, because it fails on the merits.

Petitioner also claims that his counsel was ineffective for failing to adequately advise him of the elements of each offense. Like the foregoing claim, this claim is premised on petitioner's contention that the underlying facts of the crimes do not support the charged offenses. However, for the reasons already explained, petitioner was properly indicted, and he could have been legally convicted if the prosecution presented sufficient evidence at trial to prove its theories of the cases.

Accordingly, if petitioner's counsel advised him of that reality, the advice was in fact accurate. "It is axiomatic that trial counsel is not ineffective for providing accurate legal advice." <u>Crumbley v. Crosby</u>, No. 8:04-CV-427-T-30MAP, 2007 WL 781768, at *13 (M.D. Fla. Mar. 13, 2007).

Further, to the extent that petitioner is contending that he was compelled to plead guilty because his counsel failed to subject the prosecution's case to "a meaningful adversarial testing process,"[30] the record shows otherwise. The state court record reflects that defense counsel filed numerous pretrial motions challenging various aspects of the state's case and was vigorous in his objections and the cross-examination of the state's witnesses in the days of trial preceding petitioner's decision to plead guilty.[31] The simple reality is that defense counsel did the best job possible in light of the considerable evidence pointing inexorably to his client's guilt, including Holly's damning testimony and petitioner's self-incriminating telephone calls – a task made even more difficult after petitioner decided to take the stand and deny that he was even present at Mutin's shooting despite Holly's extremely credible eyewitness identification to the contrary.[32]

Accordingly, to the extent that petitioner is contending that counsel was ineffective in advising petitioner as to the validity and strength of the state's case against him, or in failing to mount a vigorous defense to the charges, those contentions have no merit and should be rejected.

Petitioner's final contention is that his counsel was ineffective for inducing him to plead guilty to avoid a life sentence. That contention likewise has no merit.

While a defendant may not be *compelled* to plead guilty,[33] it does not follow that he may not be *induced* to do so. Although some types of inducements are impermissible – for example,

---

[30] <u>See, e.g.</u>, Rec. Docs. 1 and 5, p. 22.

[31] <u>See</u> State Rec., Vol. 8 of 18, transcript of June 6, 2012; State Rec., Vol. 9 of 18, transcript of June 7, 2012; State Rec., Vol. 9 of 18, transcript of June 8, 2012.

[32] <u>See</u> State Rec., Vol. 9 of 18, transcript of June 8, 2012, p. 45.

[33] Clearly, a plea must be "voluntary" in order to be constitutionally valid. The reason for this rule is obvious: a criminal defendant who pleads guilty "stands as a witness against himself and he is shielded by the Fifth Amendment

the state may not "induce" a defendant to plead guilty "by threats (or by promises to discontinue improper harassment)," Brady v. United States, 397 U.S. 742, 755 (1970) – others, such as an advantageous plea bargain, clearly are not. As the United States Supreme Court has explained:

> Plea bargaining flows from the mutuality of advantage to defendants and prosecutors, each with his own reasons for wanting to avoid trial. Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial.
> While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices is an inevitable – and permissible – attribute of any legitimate system which tolerates and encourages the negotiation of pleas.

Bordenkircher v. Hayes, 434 U.S. 357, 363-64 (1978) (citations, quotation marks, and brackets omitted).

Here, petitioner argues that counsel was ineffective for advising him to accept the plea bargain, opining that he gained little in the plea bargain because it provided for consecutive sentences of thirty and forty years – which, in practicality, is tantamount to a life sentence. However, petitioner was fully aware that the sentences would be consecutive. The plea colloquy contained the following exchange:

> THE COURT:
> … On the case we're trying, if the Court accepts the guilty plea, you would be sentenced to serve thirty (30) years at hard labor. Do you understand that?
>
> A. [Petitioner]  Yes, sir.
>
> Q. And the crime would be designated as a crime of violence. Do you understand that?

---

from being *compelled* to do so – hence the minimum requirement that his plea be the *voluntary* expression of *his own choice*." Brady v. United States, 397 U.S. 742, 748 (1970) (emphasis added).

A.  Yes, sir.

Q.  Now, in this second case, 499-077, the Court has agreed to accept your guilty plea, to sentence you to forty (40) years at hard labor.  The crime would be designated as a crime of violence, and this sentence of forty (40) years would run consecutively to the sentence of thirty (30) years in the present case.  Do you understand that?

A.  Yes, sir.

Q.  In other words, you're looking at a sentence of seventy (70) years at hard labor.

A.  Yes, sir.[34]

Further, petitioner's argument that he gained no benefit from the plea bargain is inaccurate.

At a minimum, he faced a mandatory minimum sentence of life imprisonment at hard labor *without benefit of parole*, probation, or suspension of sentence on each of his murder charges.  See La.

Rev. Stat. Ann. §§ 14:30 (C)(2) (on a conviction of first degree murder, "[i]f the district attorney

does not seek a capital verdict, the offender shall be punished by life imprisonment at hard labor

without benefit of parole, probation or suspension of sentence") and 30.1(B) ("Whoever commits

the crime of second degree murder shall be punished by life imprisonment at hard labor without

benefit of parole, probation, or suspension of sentence.").  The severity of such a sentence cannot

be understated.  As the United States Supreme Court has observed:

> It is true that a death sentence is "unique in its severity and irrevocability," Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable.  It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency – the remote possibility of which does not mitigate the harshness of the sentence.  Solem [v. Helm,], 463 U.S. [277,] 300-301, 103 S.Ct. 3001[, 77 L.Ed.2d 637 (1983)].  As one court observed in overturning a life without parole sentence for a juvenile defendant, this sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it

---

[34] State Rec., Vol. 9 of 18, transcript of June 8, 2012, pp. 10-11.

means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." Naovarath v. State, 105 Nev. 525, 526, 779 P.2d 944 (1989).

Graham v. Florida, 560 U.S. 48, 69-70 (2010). Here, however, the plea bargain allowed petitioner to retain his eligibility for future parole by pleading guilty to lesser offenses, thus avoiding the possibility of mandatory life sentences *without* parole. That, obviously, is no small benefit.[35]

Because the transcript reflects that petitioner entered into the plea bargain with a full understanding of its ramifications, and because he received substantial concessions in the plea bargain, the Court finds that he was legitimately *induced* to enter his pleas, *not* illegally *coerced* into doing so.

Moreover, in any event, in order to satisfy Strickland's prejudice prong in a case involving a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). While petitioner states in his application that he would not have pleaded guilty but for his counsel's purported ineffectiveness,[36] courts are not required simply to accept such self-serving statements as true. See Lee v. United States, 137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."); Hartshorn v. Prince, Civ. Action No. 12-1359, 2012 WL 3860469, at *9 (E.D. La. July 30, 2012) ("[D]espite his self-serving allegations to the contrary, the Court finds that it is not reasonably probable that petitioner would have rejected this extremely generous plea agreement. As a result, he has not

---

[35] The Court further notes that, as part of the plea bargain, the state also agreed to *nolle prosse* two other charges against him, i.e. the conspiracy to commit first degree murder charge and a marijuana charge. Id. at p. 11.
[36] Rec. Docs. 1 and 5, p. 17.

established the prejudice required to support his claim."), <u>adopted</u>, 2012 WL 3862352 (E.D. La. Sept. 5, 2012). Here, the Court finds that petitioner's self-serving statement is not alone sufficient to meet his burden of proof in light of the totality of the circumstances. Those circumstances obviously include the fact that petitioner initially insisted on going to trial, changing his mind and deciding to plead guilty only on the *fourth* day of his trial for Mutin's killing. At that point, it was apparently clear even to petitioner himself that a guilty verdict was likely in light of the state's compelling evidence. For him to decide to take the plea bargain to at least secure the sentencing concessions offered by the state was neither surprising nor indicative of coercion.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## C. Cumulative Error

Lastly, petitioner claims that relief is warranted if the effects of the foregoing claims are considered cumulatively.[37] The state disagrees, arguing that a "cumulative error" claim is not even cognizable on federal habeas corpus review.[38] There is in fact widespread disagreement and confusion as to whether such a claim can properly serve as a basis for habeas relief and, if so, under what circumstances. <u>See</u> Brian R. Means, Federal Habeas Manual § 13:4 (2018).

---

[37] Rec. Docs. 1 and 5, pp. 25-27.
[38] Rec. Doc. 13, pp. 13-14.

Nonetheless, precedent indicates that such claims are cognizable in this federal circuit, at least in extremely narrow circumstances. Specifically, regarding such claims, the United States Fifth Circuit Court of Appeals has held:

> Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process.

Turner v. Quarterman, 481 F.3d 292, 301 (5th Cir. 2007) (citation, quotation marks, and brackets omitted). However, importantly, the Fifth Circuit expressly cautioned: "As is apparent from this standard, and as this court has stated explicitly, *where individual allegations of error are not of constitutional stature or are not errors, there is nothing to cumulate*." Id. (emphasis added; footnote and quotation marks omitted); accord Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("[Petitioner] finally asserts that even if none of his claims entitles him to relief individually, all of them collectively, do. Habeas relief is available only where a prisoner is in custody in violation of the Constitution or of federal law. 28 U.S.C. § 2254. [Petitioner] cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero.").

Here, for the reasons already explained, petitioner has failed to establish that his individual claims have merit. Because that result is not changed simply by cumulating them, this cumulative error claim likewise lacks merit and should be denied.

## <u>RECOMMENDATION</u>

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by John Cunningham be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-eighth day of May, 2019.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**